7/19/6

Christopher Davis
225275
Davis vs Bishop et al
1:05 - CV - 583 - JJF

## Argument for denial of Summary Judgement

A.) Argument



B.) Affidavit

BD scanned

C.) Officer Bishops testimony From:
State of Delaware vs Christopher J. Davis
ID #0204010568
ID #0505010323
Superior Court / Sussex County
July 7, 2005

I've already submitted argument reguarding Mr. Machert. The Dewey Beach Police Dept. and the Town of Dewey Beach. Being incarcerated and awaiting my discovery request, I am pressed to present further evidence pertaining to their liability. I truly believe that discovery will reveal such evidence. The Third Circuit Court has recognized that "in civil rights cases much of the evidence can be developed only through discovery of materials held by defendant officials." (Alston v Parker 363 F.3d, 229,233 (3d 2004)). I must again request the court grant my discovery request. I hope I have satisfied Fed. R. Civ. P. 8 (a)(12) by giving a short and plain statement of the claim that will give the defendants fair notice of what my claim is and the grounds upon which it rests.

I further submit to the court my affidavit and the officer's sworn testimony as to the events that evolved between us on the morning of May 15, 2005.

My claim rests firmly on the Fourth Amendment which guarantees citizens the right "to be secure in their persons ... against unreasonable seizures." To quote Kopec v Tate (361 F.3d, 772 (3d 2004)) "The Fourth Amendment governs not only whether a person or thing is subject to 'seizure', but also 'the manner in which a ... seizure is conducted.'" My claim is that the totality of the circumstances did not justify the officer's actions and that his actions caused me bodily harm.

In Robinson v Via (821 F. 2d 913, 923 (2d Cir 1987)) the court held that testimony of bruises lasting "a couple of weeks" was "sufficient to prevent summary dismissal of a §1983 claim for excessive force." The marks on my arms and wrists took over a month to fade and 14 months later I must still be on constant medication for the pain and nerve damage caused by the officer's assault and subsequent treatment of me that morning.

I give testimony in my affidavit of officer Bishop's inappropriate remarks, actions, and attitude. Officer Bishop's testimony supports or at least gives reasonable possibility that what I say is true.

According to Graham v Conner (490 U.S. 386, 397, 109 S. Ct. 1865, 1872 104 L.Ed. 2d 443 (1989)), Factors in deciding arrestee's claim of excessive force include: (1) severity of crime at issue; (2) whether suspect poses immediate threat to safety of officers or others; (3) whether he is actively resisting arrest or attempting to evade arrest by flight; (4) possibility that persons subject to police action are violent and dangerous; (5) duration of action; (6) whether action takes place in context of effecting arrest; (7) possibility that suspect may be armed; and (8) number of persons with whom officers must contend with at one time.

The incident we are discussing lasted a brief time and the only two participants were officer Bishop

and myself. Officer Bishop had ascertained that I was unarmed and his testimony represents my demeanor as "almost lackadaisical," certainly far from threatening. I was not attempting to flee or fight, in fact, the officer's testimony is merely that I "looked" at him. Officer Bishop was not effecting arrest, he was upset that I was sitting on a car and in response to his anger he attempted to throw me to the street. That I clung to him was not resisting arrest, it was avoiding physical injury from impact. There was no threat or danger in me sitting on a car. The officer used force, excessive force, to get what he wanted and caused a chain of events to occur. An officer of the law should know better. A reasonable officer would realize that to throw an unthreatening citizen to the street would be a violation of his civil rights. A reasonable officer might have placed me under arrest but he wouldn't have assaulted me. One could not call his violence a "reasonable mistake."

The officer's demeanor (the use of vulgarity, banging his fist on my car, etc.) gives reason to suspect his hostility and unproffessionalism and therefore his testimony. Graham footnotes at 12 that "in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a fact finder may consider, along with other factors,

evidence that the officer may have harbored ill-will toward the citizen."

That officer Bishop would freely admit under oath that he "Flung(me) off the hood of the car" shows his belief that handling citizens in such a manner is O.K., But as the court has stated in Sharrar v Felsing (128 F. 3d 810, 822 (3d cir 1997)), "the officer's subjective beliefs about the legality of his or her conduct generally are irrelevant." Assaulting a citizen is an abuse of authority. What this false confidence suggests is that it is a common occurance in his daily routine and is either overlooked or encouraged by his superiors. According to Owen v City of Independence (445 U.S. at 650, 100 S. Ct. 1398) "the Civil Rights Act was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations as well." And "the knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizen's constitutional rights. Furthermore, the threat that damages might be levied against the city may encourage those in a policy making position to institute internal rules and programs designed to minimize the likelihood of

(5)

unintentional infringements on constitutional rights."

This is not an isolated incident. The Dewey Beach Police Department recklessly parade their authority with a cowboy mentality and should be checked. Owen Footnotes at 36 that "the threat of liability against a city ought to increase the attentiveness with which officials at the higher levels of government supervise the conduct of their subordinates. The need to institute system-wide measures in order to increase the vigilence with which otherwise indifferent municipal officials protect citizen's constitutional rights is, of course, particularly acute where the front line officers are judgment-proof in their individual capacities."

By no means should this case be dismissed before further discovery. The moving party has not made an initial showing that there is no genuine issue of fact and according to Frohmader v Wayne (958 F. 2d. 1024 - 10th Cir 1992): "Courts may not resolve disputed questions of material fact in order to grant summary judgment ... courts, at the summary judgement level are required to take the facts and reasonable inferences in the light most favorable to the party opposing summary judgement."

Please deny this motion and grant my request for counsel.

Christoph Joash Dee
225275

(B)     Affidavit                    7/19/6

On May 15, 2005 at approximately 1 am I was
pulled over by officer Bishop in Dewey Beach.
As traffic was heavy (the bars emptying out), I
pulled onto a side street and backed into an
empty driveway to speak with the officer. To
my dismay, officer Bishop ran up to my vehicle,
slammed his fist down on the car hood, ordered
me out and handcuffed me. I was compliant
and cordial. When I informed the officer that
I had been at the Starboard, the officer
noted with a grin that "there must be a lot
of 'pussy' there, huh?" Bewildered, I merely
nodded my head and said "uh, yea."
   I informed the officer of my dire need to
urinate but he would not allow me to relieve
myself. He uncuffed me and began to administer
field sobriety tests. To my recollection I did
fine on both the alphabet and counting tests.
   When he explained the one-leg stand test I
told him that I didn't quite get what he was
saying, sat on the hood of the car, and asked
if he would demonstrate what exactly he wanted
from me.
   He became angry and told me that I wasn't
allowed to sit on the car. I thought it was
within my rights and that my question was not
unreasonable. When I did not immediately get

down from the hood (although the officer never ordered me to get down, he merely stated that I wasn't allowed to be there), suddenly and violently, he snatched me and attempted to throw me to the street. Confused, and not wanting bodily contact with the asphalt, I merely clung as well as I could, so as not to be slammed to the ground.

Well, the next thing I knew, the officer was slamming me to the ground and cuffing me and throwing me into the back of his car. He then informed me that I was under arrest.

I was angry and felt violated and at this time I reacted to being assaulted in a less than proper manner.

Up until the officer assaulted me I was extremely cordial and compliant. I never attempted to escape or was threatening or verbally abusive. The officer was threatening and physically abusive. His reckless violence and cowboy attitude escalated the situation, trampled on my civil rights, and caused me physical injury.

1st July 2006

Judith Ann Lederman

JUDITH ANN LEDERMAN
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires August 19, 2007

1    was called as a witness by and on behalf of the State

2    of Delaware and, having been first duly sworn, was

3    examined and testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. HUME:

6        Q.   Good afternoon, Patrolman Bishop.  Are you

7    currently employed with the Dewey Beach Police

8    Department?

9        A.   Yes, sir.

10       Q.   Were you working as a Dewey Beach police

11   officer in the early morning hours of May 15th of this

12   year?

13       A.   Yes, sir.

14       Q.   Did you come into contact with Christopher

15   Davis at that time?

16       A.   Yes, sir.

17       Q.   What initially led you to come into contact

18   with Mr. Davis?

19       A.   I was sitting stationary in the left turn

20   lane of Route 1 monitoring radar for traffic going

21   southbound.  Mr. Davis approached from the rear,

22   driving half and half in the right lane and left lane.

23   I took -- I initiated my emergency equipment to stop

1    him for driving in the center of both lanes, at which
2    time --

3         THE COURT:  Can you lean forward into the
4    microphone.

5         THE WITNESS:  -- he made a right-hand turn on
6    Josephine Avenue, which is just north of Dewey Beach.
7    BY MR. HUME:

8    Q.   Did you initiate or attempt to initiate a car
9    stop on Josephine Avenue?

10   A.   Yes, sir.

11   Q.   What was the driver's response when you
12   attempted to initiate that stop?

13   A.   He started backing up in the driveway, a dirt
14   drive in front of someone's residence.  I exited my
15   vehicle.  I was banging on the hood.  I told him to
16   get out of the car.

17   Q.   You were banging on the hood of his vehicle?
18   A.   Yes, sir.

19   Q.   Prior to that, had you attempted to stop him
20   with lights and your siren?

21   A.   My lights and siren were both activated, yes,
22   sir.

23   Q.   In response to you, then he was backing up in

1    a dirt driveway?

2         A.    My lights were on.

3         Q.    At this point you exited your car and banged

4    on the hood?

5         A.    Yes.

6         Q.    What did he do at that point?

7         A.    He looked up at me and stopped.

8         Q.    Did he get out of his vehicle at that point?

9         A.    Yes, sir.

10        Q.    Did you come into contact with the driver

11   personally at that time?

12        A.    Yes.

13        Q.    Do you see that person in the courtroom

14   today?

15        A.    Yes, sitting in the white jump suit over

16   there.

17        Q.    Seated next to Mr. Brady?

18        A.    Yes, sir.

19        Q.    And were you able to determine if there was

20   any kind of odor emitting from the defendant?

21        A.    Yes, sir, I detected an odor of alcohol

22   coming from the defendant.

23        Q.    Now, on a scale of one to ten, that odor of

1    alcohol was?

2         A.    Moderate to strong.

3         Q.    Did you speak to the defendant?

4         A.    Yes, sir.

5         Q.    How would you characterize his speech?

6         A.    He seemed like he was almost lackadaisical.

7         Q.    Did you ask the defendant if he had any

8    weapons on him?

9         A.    Yes.   He said he had a pocketknife in the

10   right pocket.   I took that from him when I handcuffed

11   him.

12        Q.    Did you ask the defendant if he had been

13   drinking?

14        A.    Yes, I did.

15        Q.    What did he answer when you asked him?

16        A.    He said he was in Dewey Beach at the

17   Starboard looking for pussy, said he had --

18        Q.    I'm assuming that's a quote?

19        A.    Yes, sir.

20        Q.    Did you initiate an alphabet test to the

21   defendant?

22        A.    Yes, sir.

23        Q.    What instructions did you give to Mr. Davis?

1    A.    I advised him he needed to count

2    sequentially --

3         Q.    Pull the microphone closer to you.

4    A.    During the field test, the alphabet from B as

5    in -- I advised him to count from B to P, as in Paul,

6    at which time we performed the test.

7         Q.    Did the defendant indicate to you that he was

8    able to do this test?

9    A.    Yes, he advised me he had a two-year college

10   degree and could count properly, say the alphabet

11   properly.

12        Q.    What was his performance on the test,

13   Patrolman Bishop?

14   A.    He failed the alphabet test.

15        Q.    Can you describe specifically how his

16   performance was on the test?

17   A.    The subject went from E to F, to I to H to F

18   to I to G to H to I to J to L to M to N to O to P.

19        Q.    Prior to saying the F I and the rest you just

20   stated, did he say anything before that?

21   A.    Counted properly from B to E.

22        Q.    So just to clarify, he went from B to E and

23   ran off with what you just specifically named?

1    A.    No, sir, went from B to E.

2    Q.    I'm sorry.  Okay.

3    A.    He counted properly from the letter B to E

4    and then he messed everything else up.

5    Q.    Okay.  Did you administer a counting test?

6    A.    Yes, sir, I did.

7    Q.    What instructions did you give Mr. Davis as

8    to the counting?

9    A.    I advised Mr. Davis he needed to count

10   backwards from 69 to 51.  He started at 69 and counted

11   from 69 to 67 properly.  He then jumped to 65, 66, 64.

12   Said 64 one more time and he counted backwards to 50

13   properly.

14   Q.    Did you consider that a pass or fail?

15   A.    A fail.

16   Q.    Did you ask the defendant if he had any

17   physical abnormality or defect?

18   A.    Yes, sir.

19   Q.    He indicated?

20   A.    He advised he didn't have any abnormality or

21   physical defects that would inhibit him doing the

22   test.

23   Q.    You administered a walk and-turn test?

1      A.    I explained the one-leg stand and the
2    defendant initially --

3      Q.    I'm sorry.  The one-leg stand.  With respect
4    to the one-leg stand, did he perform that test?

5      A.    No, sir, he did not.

6      Q.    Why didn't he perform that test?

7      A.    I explained the test to the subject three
8    times.  He didn't properly understand it the first
9    time.  He was just trying to act like he didn't
10   understand it.  The third time, I explained it three
11   times and told him I'm not performing the test with
12   you, if you don't want to perform it, I will make it
13   he didn't perform the test and that will be it.  At
14   which time, he sat on the hood of the patrol car.

15     Q.    Did you, at any time, try to administer the
16   walk-and-turn test?

17     A.    No, not after that.  Upon sitting on the
18   patrol car --

19     Q.    Did you allow him to stay there?

20     A.    No, sir.

21     Q.    What did you do?

22     A.    I advised him he needed to exit the hood of
23   my patrol car, he was not permitted to sit on the

1    patrol car hood.

2        Q.    Did he get off the car?

3        A.    He looked at me.

4        Q.    At any time did he, on his own, get off the

5    hood of your patrol car?

6        A.    Not on his own, no, sir.

7        Q.    Did you then go over and attempt to remove

8    him from the hood of the patrol car?

9        A.    Yes, I grabbed him by both arms and flung him

10   off the hood of the car.

11       Q.    He then cooperated with you?

12       A.    No, sir.

13       Q.    And at that point you attempted to arrest

14   him?

15       A.    Yes, sir, I did.

16       Q.    And then again, did he cooperate?

17       A.    No, sir.

18       Q.    Did you lose any of your equipment during the

19   struggle with the defendant?

20       A.    My flashlight went flying.  However, I

21   recovered that after I placed him in handcuffs.

22       Q.    Was you uniform damaged in any way?

23       A.    Yes, sir.  I had six pockets on my BDU

DAVID WASHINGTON
Official Court Reporter

BISHOP - DIRECT

1   tactical pants and my lower left hip pocket was torn.

2        Q.   Did additional officers help you put the

3   defendant in handcuffs?

4        A.   Yes, sir.

5        Q.   How many additional officers?

6        A.   Two additional officers.

7        Q.   After the defendant was handcuffed, was he

8   placed in the back of your patrol car?

9        A.   Yes.

10       Q.   Was he seat belted?

11       A.   Yes.

12       Q.   Did he stay in the seat belt?

13       A.   No, sir.

14       Q.   How many times did he get out of the seat

15   belt?

16       A.   Three times.

17       Q.   Was he told at any time to stay seat belted?

18       A.   Yes, sir.

19       Q.   Was he told that prior to getting out of the

20   seat belt?

21       A.   He was told to sit in the seat, I would be

22   with him shortly, that we needed to search his

23   vehicle.

1        Q.    Once he got out of the seat belt, did he

2   cause any damage to the patrol vehicle?

3        A.    Yes, he kicked out my right rear window.

4        Q.    Were you assisted by PFC Bullard with this

5   incident?

6        A.    Yes, sir, he assisted me to Lewis hospital in

7   getting Mr. Davis into the hospital.

8        Q.    Was PFC Bullard caught up in the incident in

9   anyway?

10       A.    Yes, Mr. Davis attempted to bite PFC Bullard.

11       Q.    Was it an attempt or did he actually bite

12   him?

13       A.    No.  He made contact with his uniform.  He

14   didn't make contact with the skin, though.

15       Q.    Now, upon arriving -- was this Beebe

16   Hospital?

17       A.    Yes, sir.

18       Q.    Did you notice whether Mr. Davis' clothes

19   were soiled in any way?

20       A.    Not until he got in the hospital.

21       Q.    But once in the hospital, did you notice they

22   were soiled?

23       A.    Yes, sir.

1      Q.    How were they soiled?

2      A.    He had urinated in his pants.

3      Q.    Upon seeing this, did you go back and inspect

4   the patrol car?

5      A.    After we finished with him in the hospital,

6   yes, sir.

7      Q.    And was anything left in your patrol car?

8      A.    My floor was wet.

9      Q.    Which appeared to be from?

10     A.    Urinating there.

11           THE COURT:  Does he ask at any time to go to

12   the bathroom before he did this?

13           THE WITNESS:  Initially he had asked when I

14   had him exit the vehicle at the beginning of the

15   traffic stop.  I asked him to perform my tests, at

16   which point I would allow him to use the bathroom

17   after.

18           THE COURT:  How about the alleged arson?

19           THE WITNESS:  Me and Officer Elliott, at

20   3:17, were walking in the station and observed the

21   smell of smoke in the location of the cell and saw a

22   burn mark on the bench and a blue Bic lighter that had

23   been cxploded on the floor.

1        THE COURT:  Anybody else in the cell other

2   than him?

3        THE WITNESS:  No, sir.

4   BY MR. HUME:

5   Q.   Did you find the defendant's watch, Patrolman

6   Bishop?

7   A.   Yes, sir.

8   Q.   And when the watch -- was the watch still

9   intact?

10  A.   The watch had been jimmied rigged.  Mr. Davis

11  was playing within our cell -- our cell is maybe like

12  a five-by-seven area.  In the cell, in the rear

13  portion we have grates that block the windows off so

14  people can't get out of the window.  He had been

15  playing with his watch in an attempt to loosen the

16  grate.

17  Q.   And at any time did the defendant threaten

18  you?

19  A.   On the way back from Beebe Hospital he

20  advised me he was going to kill me.

21  Q.   Based on your training and experience,

22  Patrolman Bishop, were you able to form an opinion

23  whether the defendant was under the influence?

1          A.    Yes, sir.

2          Q.    What was your opinion?

3          A.    My opinion he was highly intoxicated, as well

4      as probably under the influence of drugs.

5                MR. HUME:   No further questions, Your Honor.

6                THE COURT:   I presume the blood test is not

7      back?

8                MR. HUME:   It's not back, Your Honor.

9                THE COURT:   Mr. Brady.

10               MR. BRADY:   Your Honor, if I could have a

11     moment.

12               (Pause.)

13                         CROSS-EXAMINATION

14     BY MR. BRADY:

15         Q.    Good afternoon, Officer.

16         A.    Good afternoon, sir.

17         Q.    Did you find any drugs or drug paraphernalia

18     when you searched his car?

19         A.    No, sir.

20         Q.    So your opinion as to being under the

21     influence of drugs is your educated guess, because

22     there was no evidence to support that, correct?

23         A.    Yes, sir.

1     Q.   Did you find any alcohol, liquor, beverage

2     containers in the vehicle when you searched it?

3          A.   No, sir.

4          Q.   St. Louis Avenue or St. Louis Street, that

5     was the street he was riding on when you first

6     observed him?

7          A.   No, he was riding on State Route 1

8     northbound, crossing the intersection of St. Louis

9     Street when I observed him.

10         Q.   I'm sorry.  I'm just relying on what is on

11    the admin warrant, which you did not prepare.  They

12    had it he was on St. Louis Street.  He was northbound

13    crossing St. Louis just by the real estate office?

14         A.   St. Louis Street by East Maui.

15         Q.   East of Maui by the real estate office?

16         A.   Yes, sir, that's it.

17         Q.   It is that location you saw him?

18         A.   I observed him northbound to that.  So maybe

19    St. Louis Street is northbound to that, so --

20         Q.   What time of night was this?

21         A.   1:05.

22         Q.   And if I understood you correctly, when he

23    didn't -- drawing your attention to him on the hood of

DAVID WASHINGTON
Official Court Reporter

1   your car after he failed to do the walk-and-turn test,

2   how was he removed from the hood of your car?

3        A.   I didn't have him perform the walk-and-turn

4   test.  I explained the one-leg stand to him three

5   times.

6        Q.   I'm sorry.  He was sitting on the hood of

7   your car at that point.

8        A.   He sat on the hood of my car at that point.

9        Q.   How was he removed from the hood of your car?

10       A.   Grabbed by both arms and kind of pushed off

11   the hood.

12       Q.   Were you the only officer there at that

13   point?

14       A.   Yes, sir.

15       Q.   And in response to Judge Graves' question, he

16   did, at some point, say: I need to use the bathroom?

17       A.   When I initially had him exit the vehicle at

18   the beginning of the traffic stop, he advised he had

19   to urinate.  I told him to be patient with me and

20   perform some of my tests and I'd let him urinate.

21            MR. BRADY:  Your Honor, if I may have a

22   moment.

23            (Pause.)